# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| KENITA LAVETTE MCLEMORE, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:10-01105 |
| v. | ) | Judge Wiseman/Brown |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

To:     The Honorable Thomas Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II of the Social Security Act (the "Act"), as amended.  Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record.  (Docket Entries 14, 14-1).  In turn, the Commissioner responded and Plaintiff filed a reply.[1]  (Docket Entries 21, 23). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr.").  (Docket Entry 11).  For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **GRANTED** and this action be **REMANDED**.

## I.  INTRODUCTION

---

[1]The Commissioner's response (Docket Entry 21) is 35 pages in length.  This conforms with the Magistrate Judge's Order, granting in part and denying in part Commissioner's Motion for Leave to file a 52 page brief–exceeding the Court's customary 25-page limitation.  (Docket Entries 19, 20).

Plaintiff protectively filed applications for DIB and SSI on June 11, 2007, alleging disability since March 1, 2007. (Tr. 10). The Commissioner denied both applications initially and on reconsideration. *Id*. Upon Plaintiff's timely request, a hearing before administrative law judge ("ALJ") John R. Daughtry was held on December 29, 2009. (Tr. 28-50). The ALJ issued an unfavorable decision on February 5, 2010. (Tr. 10-22).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2,      The claimant has [not] worked at the substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).[2]

3.      The claimant has bi-polar disorder; panic disorder; generalized anxiety disorder; attention deficit disorder (ADD); borderline intellectual functioning (BIF); hypertension; and history of subarachnoid hemorrhage and hepatitis C; which are considered a "severe" combination of impairments, but not severe enough, either singly or in combination, to meet or medically equal the requirements set forth in the Listing of Impairments. Appendix I to Subpart P, Regulations No. 4.

4.      After consideration of the entire record viewing the case in a light most favorable to the claimant and giving her the benefit of doubt, despite very limited treatment, the Administrative Law Judge finds that the claimant has the residual functional capacity to lift and carry 10 pounds at least occasionally; stand and walk for up to four hours in an eight-hour workday; sit up to six hours in an eight-hour workday; with unlimited ability to push and pull; occasional ability to climb, balance, stoop, kneel, crouch, crawl, and squat; and must avoid concentrated exposure to heat, humidity and chemicals that may affect liver function. Additionally, she is able to understand, remember and carry out one-to-two step instructions; maintain

---

[2]As the Commissioner points out (Docket Entry 21, p.8), it appears a typographical error makes for a confusing record. The ALJ states: "The claimant's earnings record reveals reported earnings of $10,559 in 2006, an amount that exceeds that annual threshold for substantial gainful activity for that particular year (i.e. $10,320). The claimant also worked and has reported earnings in 2007, 2008 and 2009, but earnings reported from this work activity did [*not*] reach gainful activity levels for those particular years." (Tr. 12). It appears the word "not" was accidentally omitted and the ALJ found that Plaintiff has not worked at the substantial gainful activity since the alleged onset date.

concentration and persistence necessary for one-to two step tasks; able to have infrequent contact with the general public and at least occasional interaction with co-workers and supervisors; and has the ability to adapt to infrequent change in a workplace; but, cannot perform production rate, pace assembly-line work.

5. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6. The claimant is 42 years old, described as a younger individual (20 CFR 404.1563 and 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Appeals Council denied Plaintiff's request for review on September 21, 2010. (Tr. 1-3). Plaintiff filed the pending action on March 31, 2011. (Docket Entries 14, 14-1).

## II. REVIEW OF THE RECORD

Plaintiff was born on November 15, 1967, making her 42 years old when the ALJ issued his decision. (Tr. 32). She did not complete school beyond the ninth grade. (Tr. 33). Plaintiff is not currently working and last performed part-time work in 2009. (Tr. 12, 36-37).

Plaintiff's documented history of health problems date back to February 1991, when she was admitted to the hospital with a subarachnoid hemorrhage. She underwent a craniotomy for

aneurysm and pituitary mass. (Tr. 217-24). In October 1995, Plaintiff was admitted to the hospital for two days after complaining of headaches and vomiting. After a CT scan of the head failed to demonstrate any subarachnoid blood, she was started on codeine and Phenergan for her symptoms. (Tr. 225-30).

On December 29, 2003, family physician Carolyn Lightford, M.D., assessed that Plaintiff had Hepatitis C Infection, Iron Deficiency Anemia, Anxiety Disorder NOS and Depressive Disorder NEC. (Tr. 235-38). At this same time, Plaintiff was taking prescriptions Accupril and Xanax, which were refilled by Dr. Lightford. *Id.*

Plaintiff began a series of visits to Vanderbilt Mental Health Center ("Vanderbilt") in July 2004. (Tr. 363-429). Her initial evaluation was completed by Michael H. Leach on July 15, 2004. (Tr. 365). Pursuant to Plaintiff's treatment plan, it was recommended that she begin therapy sessions with Vanderbilt physician Tammy Suggs, M.D. (Tr. 364).

Plaintiff saw Dr. Suggs a total of eight times, from August 2004 until February 2005. (Tr. 379-426). Plaintiff consistently complained of mental health problems like anxiety, agitation and insomnia. *Id.* By Plaintiff's fourth visit in October 2004, Dr. Suggs noted "much less significant anxiety and agitation[,]" and noted that Plaintiff "definitely feels the [medication] has calmed her[.]" (Tr. 404-05). In December 2004, Plaintiff requested that Dr. Suggs write a letter on her behalf "that states she cannot work." (Tr. 399). When Dr. Suggs asked why Plaintiff felt she should not work, Plaintiff responded she was "just tired." *Id.* During their next appointment, Plaintiff and Dr. Suggs wrote a letter that Plaintiff took her with to the disability office. (Tr. 393). By February 2005, however, Plaintiff asked Dr. Suggs "to write her a letter stating that she could go back to work without restrictions[,] which she felt she could do[.]" (Tr. 386). At the

same time, Plaintiff informed Dr. Suggs that she would apply for disability.  In response, Dr.

Suggs confronted Plaintiff about applying for disability at the same time she believed she could

work without restrictions.  *Id*.  Dr. Suggs' supervisor, Vastal Thakkar, M.D., participated in the

second half of the February 2005 meeting.  *Id*.  Plaintiff voiced frustration when Dr. Thakkar

talked about symptoms, treatment options and disability determinations.  *Id*.  After review of

Plaintiff's progress notes, Dr. Thakkar decided to "defer disability letter/eval [sic] since there is

not enough evidence to support it."  (Tr. 384).  Despite Dr. Suggs' recommendation that Plaintiff

return two weeks later, Plaintiff did not see Dr. Suggs until their eighth and final visit in June

2005.  (Tr. 390, 380).

During the time period in which she was seeing Dr. Suggs, Plaintiff also visited other

physicians.  In September 2005, Plaintiff presented to Nancy Rumson Yoanidis, M.D. of Mental

Health Cooperative, Inc. with headaches and anger.  (Tr. 250-53).  Dr. Yoanidis diagnosed

Plaintiff with Bipolar Disorder; Posttraumatic Stress Disorder; Panic Disorder; and a GAF of 40.

*Id*.  In November and December of 2005, Plaintiff visited Vanderbilt to see Stephan Carlson,

M.D.  (Tr. 371-78).  Dr. Carlson diagnosed Plaintiff with Bipolar Disorder NOS and Personality

Disorder NOG.  *Id*.

In what was her last visit to Vanderbilt, Plaintiff saw Adrienne W. Hollis on September 1,

2006.  (Tr. 366-70).  Plaintiff's diagnostic assessment lists Mood Disorder NOS and Personality

Disorder NOS.  (Tr. 366).  Despite a return appointment two weeks later, there is no evidence in

the record that Plaintiff visited Vanderbilt after September 2006.  (Tr. 370, 363-429).

In the fall of 2006, Plaintiff saw a host of physicians in connection with her disability

applications.  In a Consultative Examination Report dated September 26, 2006, Bruce. A. Davis,

M.D., provided a list of work-related physical activities Plaintiff could perform. (Tr. 430-32).

With limitations, these included lifting/carrying 10 pounds, standing and walking for four to eight

hours and sitting for eight hours. *Id*. In a Consultative Examination Report dated October 13,

2006, Elliot Ward, Ph.D, noted that Plaintiff was on time, able to interact and did not appear to

have delusions or paranoia. (Tr. 433-37). Dr. Ward concluded that "[d]ue to the vagueness of

[Plaintiff's] information and the extent of malingering during [her] Mental Status, the judgment

about functional capacity cannot be made with any degree of confidence." (Tr. 437). In a

Physical RFC Assessment dated October 17, 2006, medical consultant James B. Millis, M.D.,

noted that Plaintiff had a limited RFC to occasionally lift/carry 20 pounds, frequently lift/carry 10

pounds, stand and walk for four hours and use her left upper extremity limited to frequently. (Tr.

438-45). In a Psychiatric Review Technique dated October 26, 2005, medical consultant Victor

L. O'Bryan, Ph.D., found there was insufficient evidence regarding Plaintiff's medical

disposition. (Tr. 446-58). Specifically, he noted Plaintiff's case was "insufficient" due to her

"malingering" and "failure to cooperate." (Tr. 458).

In early 2007, Plaintiff visited with Frederick Junard, M.D., of Bell Medical Center.[3] (Tr.

461-69). On February 15, 2007, Plaintiff had a follow-up evaluation for hypertension and

anxiety. (Tr. 469). She presented with frequent, burning dysuria and, otherwise, Dr. Junard's

examination findings were normal. *Id*. Two weeks later, on March 1, 2007, Plaintiff followed up

with Dr. Junard for Hypertension and bipolar disorder (Tr. 467). Dr. Junard found Plaintiff to

have "full" range of motion; "normal" muscle power and tone, coordination, gait and sensation;

---

[3]The record contains progress notes for two visits only: February 15, 2007 and March 1, 2007. It appears the February visit was scheduled as a follow-up appointment from a previous, unspecified date. (Tr. 469).

and "appropriate" mood, insight, judgment and concentration. (Tr. 461). That said, Dr. Junard also noted his impressions of hypertension, bipolar discover and Xanax dependence. (Tr. 468). Dr. Junard recommended that Plaintiff follow up with a psychiatrist. *Id.*

On March 15, 2007, Plaintiff presented to Shahidul Islam, M.D., per the referral by Dr. Junard. (Tr. 513-24). This was the first of seven meetings between Plaintiff and Dr. Islam in 2007. Plaintiff reported to Dr. Islam that she was working as a nurse. (Tr. 519). In an initial clinical survey, Plaintiff listed her main complaints as tragedies in her life, a former brain aneurism, high blood pressure, a scary and abusive romantic relationship, grief and difficulties in expressing her feelings. (Tr. 522-24). Plaintiff also wrote that "Xanax works well with my panic attacks [and] anxiety when I'm angry to calm me down." (Tr. 524). At this first appointment, Dr. Islam diagnosed Plaintiff with Panic Disorder, Attention Deficit Disorder and Insomnia. (Tr. 515). Dr. Islam prescribed Plaintiff Doxepin, Klonopin, Xanax and Adderall. *Id*.

Plaintiff followed up with Dr. Islam on April 5, 2007 and claimed that she had lost her job and had trouble sleeping. (Tr. 519). Dr. Islam doubled Plaintiff's Doxepin dosage and continued her other prescriptions. *Id*. On April 15, 2007, Plaintiff again saw Dr. Islam and reported that, while on the medications, she was able to sleep at night and concentrate. *Id.* Plaintiff next saw Dr. Islam on June 6, 2007, reporting that she ran out of her medications and was having a relapse of her symptoms. *Id*.

July 2, 2007 marked Plaintiff's fifth appointment with Dr. Islam–where she presented with anger management issues and disclosed being sexually abused as a child. (Tr. 520). On this same date, Dr. Islam completed documentation provided to her by the Tennessee Department of Human Services. (Tr. 514, 516). Dr. Islam indicated that Plaintiff suffered from a mental

disorder, had hallucinations/delusions in the past, and assessed her mood as depressed, anxious and irritable. (Tr. 514) Still, Dr. Islam did not report that Plaintiff's "mild-moderate" mood warranted psychiatric evaluation. *Id*. Dr. Islam noted additional norms: adequate memory; essentially normal thinking and affect; normal psychomotor disturbance; no drug or alcohol abuse; no mental retardation; adequate interactions with others; and adequate concentration. *Id*. When asked to elaborate on Plaintiff's condition, however, Dr. Islam apparently contradicted some of his earlier findings, stating Plaintiff was "unable to concentrate [and] easily distracted." (Tr. 516) In completing the report, Dr. Islam again noted Plaintiff's complaints and diagnoses of Panic Disorder, Attention Deficit Disorder and Insomnia. *Id*.

Plaintiff's saw Dr. Islam twice more in August 2007. On August 1, 2007, Plaintiff claimed she was unable to sleep and experienced panic attacks. (Tr. 520) By August 18, 2007, however, Plaintiff reported that she could sleep at night with the medications. (Tr. 521) The record does not indicate any meetings between Plaintiff and Dr. Islam after August 2007. On November 20, 2007, Dr. Islam wrote a letter regarding his recurring visits with Plaintiff. (Tr. 515) He stated that Plaintiff's panic attacks and mental problems "interfere with her ability to perform her job" and that "her ability to perform structured job responsibilities is difficult." *Id*. Dr. Islam did not offer any remarks on specific impairments or job limitations.

In August 2007, Marvin H. Cohn, M.D., a medical consultant, completed a Physical RFC Assessment. (Tr. 476-83) Dr. Cohn opined that Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand, walk and sit for a total of 6 hours in an 8-hour workday; and push/pull without further limitation. (Tr. 476-78) Dr. Cohn further opined that Plaintiff did not suffer from any postural; manipulative; visual; communicative; or environmental

limitation. (Tr. 478-80). Dr. Cohn noted that Plaintiff "is considered partially credible as her alleged conditions exist but the are not substantially disabling." (Tr. 483).

In September 2007, Debrah Doineau, Ed.D., completed a psychological evaluation of Plaintiff. (Tr. 484-90). Dr. Doineau's diagnostic impressions included general mood and personality disorders–but ruled out psychotic disorder. (Tr. 488). Dr. Doineau opined that Plaintiff had "mild limitation" with understanding, remembering and adaptability; "moderate limitation" with sustaining concentration and pace; and "possible marked limitation" with social interaction. *Id*. Dr. Doineau observed that Plaintiff "was very evasive, uncooperative, and a difficult person from which to retrieve information." (Tr. 484-85). Dr. Doineau questioned Plaintiff's credibility and based her evaluation only on the interview and information provided by Plaintiff. (Tr. 485). To that end, Dr. Doineau "highly recommended" additional sources of information to readers of her report. *Id*. Dr. Doineau ended her report by noting that "the fact that [Plaintiff] was uncooperative and evasive does not preclude the possibility that she has a severe disabling condition." (Tr. 488-89).

Also in September 2007, Rudy Warren, M.D., prepared a Psychiatric Review Technique and Mental RFC Assessment. (Tr. 491-508). Dr. Warren opined that Plaintiff had "mild" restriction of activities of daily living; "moderate" difficulties in maintaining social functioning and concentration, persistence or pace; and no extended episodes of decompensation. (Tr. 501). He also noted that Plaintiff has the ability to understand and remember simple instructions; concentrate for a period of at least two hours; relate appropriately to others; and adapt to routine workplace changes. (Tr. 507).

In February 2008, Thomas L. Pettigrew, Ed.D, completed a psychological evaluation of

Plaintiff. (Tr. 527-32). Dr. Pettigrew was "impressed with significant difficulty in obtaining complete and adequate history from [Plaintiff]." (Tr. 531-32). He opined that Plantiff appeared capable of handling verbal instructions and demonstrated effective language skills. Based on Plaintiff's responses during the interview, Dr. Pettigrew did not infer any prolems with attention, concentration or memory. He further opined that Plaintiff is "considered capable of managing disability funds." (Tr. 532).

In March 2008, another consultant, Andrew J. Phay, Ph.D., completed a Psychiatric Review Technique and Mental RFC Assessment. (Tr. 533-50). Dr. Phay opined that Plaintiff had "mild" restrictions in daily living; "moderate" difficulties in maintaining social functioning, concentration, persistence or pace; and no episodes of extended decompensation. (Tr. 543). He also assessed that Plaintiff was not limited in understanding, memory and adaption. (Tr. 547-48). In certain instances, Dr. Phay opined that Plaintiff was "moderately limited" in sustained concentration and persistence, and social interaction. *Id*.

Numerous records dating from March 2008 to December 2008 are provided by Mental Health Cooperative, Inc. ("MHC"). (Tr. 551-607). On March 17, 2008, Plaintiff presented to Donna Kreuze, an assistant clinician. (Tr. 556). Ms. Krueze noted that Plaintiff had "marked" impairment with activities of daily living and adaption to change, and "moderate" impairment with interpersonal functioning and concentration, task performance and pace. (Tr. 552-53). Ms. Krueze also assessed that Plaintiff had a GAF of 47. (Tr. 554).

After Plaintiff's March 17, 2008 visit, MHC made numerous failed attempts to contact Plaintiff and Plaintiff did not arrive at scheduled appointments. (Tr. 563-67, 574-75, 603-06). MHC did make contact with Plaintiff on April 8, 2008, when a case manager traveled to

Plaintiff's residence.  (Tr. 568).  Plaintiff told the case manager that she needed to borrow money.  Specifically, Plaintiff reported that she had been to jail and was unable to pay her rent.  *Id*.  Plaintiff also reported that she was seeing a private psychiatrist.  *Id*.

On April 28, 2008, a MHC case manager visited Plaintiff's apartment after several failed attempts.  (Tr. 574-76).  Plaintiff did not allow the case manager to come inside the home, but they sat outside and Plaintiff discussed her money problems.  (Tr. 576).  Plaintiff further reported that she has no interest in a vocational education program because of her "health issue" and the risk it would "jeopardize her SSI appeal."  *Id*.

Plaintiff again visited MHC in May 2008.  On May 15, 2008, Plaintiff reported "no concerns with her mental health."  (Tr. 580).  Nonetheless, Plaintiff was apparently "in the process of applying for disability."  *Id*.  On June 9, 2008, a MHC case worker visited Plaintiff at her daughter's home.  (Tr. 583).  At this time, Plaintiff had "no health concerns to address" and was receiving "support from friends and family."  *Id*.  On July 26, 2008, a MHC case worker again visited Plaintiff at her home.  (Tr. 591).  Plaintiff reported that she "works a full time job" and "had no health concerns."  *Id*.

In August 2008, MHC case managers twice met with Plaintiff at her home.  (Tr. 593-94).  Plaintiff reported that she "was recently incarcerated for domestic violence and her [boyfriend] has a restraining order against her but she is continuing to live with him because she has nowhere else to go."  (Tr. 594).  In September 2008, Plaintiff met with a MHC case manager and reported that she "works a part time job and is applying for SSDI."  (Tr. 595).

On October 3, 2008, a MHC case manager picked Plaintiff up and drove her to a court hearing, where Plaintiff was sentenced to ten days of incarceration for contempt of a release

agreement from August 2008. (Tr. 597). Plaintiff began serving her ten day sentence on October 8, 2008, and, at that time, "reported no major emotional mental health crisis[.]" (Tr. 598). In November and December of 2009, MHC case managers were unsuccessful in their attempts to locate and correspond with Plaintiff. (Tr. 603-08). The record does not indicate that Plaintiff received treatment from MHC after October 2008.

The most recent medical assessment of Plaintiff found in the record relates to Saran V. Mudumbi, M.D., of Psychiatric Associates. (Tr. 608-22). Plaintiff saw Dr. Mudumbi in March, April, and June of 2008, and in February and August of 2009. (Tr. 616-18, 608-15). Dr. Mudumbi assessed that Plaintiff possessed: fair eye contact; fair hygiene; fair insight; normal speech; logical thought process; normal thought content; unimpaired judgment and good memory. (Tr. 609, 610, 612-13, 614-15). Those findings aside, Dr. Mudumni diagnosed Plaintiff with Bipolar Disorder; Panic Disorder; Attention Deficit Disorder; severe and enduring Psychosocial and Environmental Problems; and a GAF score of 50. (Tr. 609, 611, 613, 615). In August 2009, Dr. Mudumbi also noted that Plaintiff's drug screening test was positive for marijuana use. (Tr. 612, 614-15, 620-22). On August 27, 2009, Dr. Mudumbi recommended that Plaintiff return for a follow up appointment two weeks later. (Tr. 615). The record, however, contains no evidence that Plaintiff saw Dr. Mudumbi after August 2009.

At her administrative hearing, Plaintiff testified that she is living in an apartment with a male friend who she has lived with for the past two years. (Tr. 32). Plaintiff has seven children, but does not have custody of them. (Tr. 33).

Plaintiff estimates she stands 5'7 and weighs 180 pounds. *Id.* Plaintiff stated that ninth grade is the last grade she completed. Plaintiff's driving privileges were revoked and she does

not currently have a driver's license.  (Tr. 34).  She can read and write "certain things," like headlines on a newspaper and she can perform "some" basic arithmetic.  (Tr. 34-35).

Plaintiff testified that she does not have any current sources of income.  (Tr. 35).  She does receive $160 in food stamps on a monthly basis.[4]  *Id.*  Plaintiff reported that she has health insurance.  (Tr. 36).  That said, she stated she has not received any other type of government benefit since her alleged onset date of March 1, 2007.  *Id.*

When asked about the last time she worked, Plaintiff stated it had been "about a year and a half or two."  *Id.*  Plaintiff then testified, however, that she did  work in 2009 and could not remember whether she worked in 2008.  (Tr. 36-37).  Plaintiff stated she has not performed any job during the last 15 years that lasted longer than three months.  (Tr. 37).

Plaintiff testified that she has never smoked tobacco cigarettes or consumed alcohol.  (Tr. 38).  Plaintiff also stated she has never abused prescription medication.  *Id.*  As to "street drugs," Plaintiff testified that she has never used–but she has "been around them."  *Id.*

Plaintiff stated that she had been in jail on four occasions in 2009.  (Tr. 38-39).  As of the hearing date, Plaintiff reported that she was on probation for domestic violence charges.  (Tr. 39).

When asked to explain why she filed a disability claim, Plaintiff described both mental and physical problems.  (Tr. 39-41).  Plaintiff mentioned problems with focusing; conflicts with coworkers; having to call in sick; and anger.  (Tr. 40).  Specifically, Plaintiff stated she has "attacked coworkers, [but] not intentionally."  Regarding physical problems, Plaintiff noted daily headaches and trouble falling asleep.  *Id.*  Plaintiff testified that she "just found out [she has] another medical problem."  *Id.*

---

[4]At the hearing, Plaintiff stated she had been receiving the food stamps for "four months." (Tr. 35-36).

For her headaches, Plaintiff stated she was seeking treatment at "the Villages at Vanderbilt." (Tr. 41). She claims to be "on Lamictal, Abilify, [and] Lorazepam." (Tr. 40). Further, Plaintiff testified that she received an unspecified shot once a week to treat her migraines.[5] (Tr. 40-41).

Regarding daily activities, Plaintiff testified that she is depressed "most of the time." (Tr. 41). It is "hard for [Plaintiff] to stay awake" and she lays around and sleeps "a whole lot." *Id*. Plaintiff claims the man she lives with "does the shopping" and estimates that it has been "maybe four years" since the last time she shopped for groceries. *Id*.

Plaintiff reported that she has family and friends in the area–and that she does "associate with them." (Tr. 41-42). When asked if she socializes with them, Plaintiff mentiond her oldest daughter, who is 23 years old. (Tr. 42). Speaking of her daughter, Plaintiff stated: "she lives down the street . . . And she helps me a lot. And she comes and checks on me. She's the one that has, you know, the custody of my children." *Id*.

Plaintiff testified that she no longer has hobbies she enjoyed in the past, like "going around with [her] friends" and "activities with the church." (Tr. 42-43). Plaintiff said she "had a bad experience" and does not attend religious services anymore. (Tr. 42). She reports being more content when she is by herself, because she is always "getting into confrontations" and feeling "real anxious" when she is "out around people." *Id*. Plaintiff testified that she does not watch television or read, and would rather sleep. (Tr. 43).

Plaintiff's attorney asked her questions at the hearing and Plaintiff confirmed that she

_____

[5]Plaintiff described receiving a weekly shot: "And the shot that they give me, I don't know what it is. That's for the migraines where I have to go to them once a week. And they put me in a dark room. They give me a shot of this stuff. And I have to stay there for, like, so many hours." (Tr. 40-41).

previously received disability benefits after suffering a brain hemorrhage.  (Tr. 43).  Plaintiff

stated she has been treated for mental health problems "since, like, 2000."  (Tr. 44).  When asked

by her attorney, Plaintiff confirmed that she once arrived at his office wearing her pajamas.  *Id*.

Gary Sturgell, the vocational expert ("VE"), also testified at Plaintiff's administrative

hearing.  (Tr. 44-49).  When the ALJ asked him the identify and classify Plaintiff's past work of

record, the VE stated "nurse assistant."  (Tr. 45).  The VE said that occupation "would meet the

standards of SGA [substantial gainful activity]."  *Id*.  The Dictionary of Occupational Titles

classifies a nurse assistant's work as "medium and semi-skilled" and such work has a "SVP

[specific vocational preparation] of four."  *Id*.  The VE did not identify any other jobs.

The ALJ then asked the VE to consider a hypothetical individual that can lift and carry 20

pounds occasionally; can stand, walk and sit for up for six hours in an eight hour work day; can

perform work that allows for moderate limitations in the ability to understand, remember and

carry out detailed job instructions, moderate limitations in relating to the general public and

maintaining concentration and attention for extended periods of time, and in completing a normal

workday without interruptions from psychologically based symptoms.  (Tr. 45-46).  Specifically,

the ALJ asked if such a hypothetical individual could perform the Plaintiff's past work of record.

The VE answered "no."  (Tr. 46).  The VE then stated that such a hypothetical person could

perform "unskilled, light jobs for persons having less than a high school diploma."  *Id.*  The VE

provided examples, including: "general office clerks, numbering approximately 800 in the state

economy, and approximately 42,000 in the national economy.  Counter clerks, numbering

approximately 1,100 in the state economy, and approximately 50,000 in the national economy.

Housekeepers, numbering approximately 4,900 in the state economy, and approximately 260,000

in the national economy." (Tr. 46-47).

The ALJ asked the VE to consider a second hypothetical, this time assuming an individual that can lift and carry up to 10 pounds occasionally or frequently; can stand or walk for four hours and sit for six hours in an eight hour work day with normal breaks; can engage in unlimited pushing and pulling; can engage in occasional postural activities, climbing, balancing, stooping, kneeling, crouching, crawling [and] squatting. The hypothetical individual should avoid concentrated exposure to heat, humidity or chemicals that might affect the liver. The hypothetical individual may have mental limitations (but can understand, remember and carry out one to two step directions); and can maintain concentration and persistence necessary to perform one to two step tasks. The hypothetical individual should have no more than infrequent contact with the general public; can have at least occasional interaction with coworkers and supervisors; can adapt to infrequent changes in the workplace; and should not be in jobs that involve production rate pace (like assembly line work). (Tr. 47). Specifically, the ALJ asked if such a hypothetical individual could perform jobs that exist in the national or regional economy. The VE answered "yes." (Tr. 48). The VE then identified a list of unskilled positions for persons having a limited education: "unarmed security guards, numbering approximately 900 in the state economy, and approximately 49,000 in the national economy[;] data entry clerks, numbering approximately 700 in the state economy and approximately 37,000 in the national economy [and] inspectors and sorters, numbering approximately 600 in the state economy and approximately 29,000 in the national economy." *Id.*

Plaintiff's attorney then questioned the VE. (Tr. 48-49). The attorney asked whether a GAF score of 47 (and consistent or persistent GAF scores of 50 or below over the period of a

16

year), with medication compliance, would affect Plaintiff's ability to perform work on a full-time basis. The VE responded: "50 is the upper most point of severe range of impairment on that scale. And so, occasionally speaking, a person who persists at that level or below, usually is rendered unemployable." (Tr. 49). The attorney then asked the VE whether the Plaintiff's employability would be impacted by the problems she testified to (deeming it credible)–specifically the side effects from medication and argument outbursts. *Id*. The VE again answered that such ailments would render a person unemployable. *Id*.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff alleges seven errors in the ALJ's decision. First, the ALJ erred by not finding that Plaintiff meets the requirements of Listings 11.18, 12.02, 12.04, 12.06 and 12.08. Second, the ALJ erred in finding that Plaintiff can perform a limited range of sedentary work. Third, the ALJ erred by failing to consider all the evidence before him. Fourth, the ALJ erred by not giving proper weight to the opinions of the treating physicians. Fifth, the ALJ committed reversible error in evaluating Plaintiff's subjective limitations. Sixth, the ALJ committed reversible error in failing to correctly evaluate Plaintiff's mental conditions. Seventh, the ALJ erred in relying on the testimony of the VE. (Docket Entry 14-1, p.1-2).

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

17

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.      If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.      If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.      If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[6] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

---

[6] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

4.    If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.    Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analyses required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.    The ALJ Properly Determined Plaintiff Does Not Meet or Equal the Requirements of

Listings 11.18, 12.02, 12.04, 12.06 and 12.08

Plaintiff argues that the ALJ erred by not finding that her mental impairments met or equaled the criteria of listings 11.18, 12.02, 12.04, 12.06 and 12.08.[7]  When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment."  20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.00; *see* 20 C.F.R. § 404.1520a.  The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment.  *Id.*

_____

[7]Listing 11.18 (cerebral trauma) calls for evaluation under listings 11.02, 11.03, 11.04 and 12.02.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §11.18.  In this case, however, Plaintiff only alleges (and the Magistrate Judge only reviews) that her cerebral trauma meets or equals listing 12.02.

The ALJ must also evaluate so-called "B" and "C" criteria: impairment-related functional limitations that disrupt the ability to do any gainful activity. These limitations must be a result of the diagnostic description manifested by the "A" findings. *Id*.

For Plaintiff to meet or equal the requirements of 12.02, 12.04 or 12.06, her impairment must satisfy the corresponding "B" criteria *or* "C" criteria. As for the 12.08 listing, no "C" criteria exists–so Plaintiff must satisfy the applicable "B" criteria. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.02, 12.04, 12.06, 12.08. The Magistrate Judge believes the ALJ properly concluded that Plaintiff's impairments failed to satisfy the applicable criteria.

In order to satisfy the "B" criteria of Plaintiff's listings, her mental problems (i.e. "A" criteria) must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. *Id*. The ALJ found that Plaintiff has "moderate restriction of activities of daily living; moderate to marked limitations in social functioning; moderate limitations in concentration, persistence, or pace; and no episodes of decompensation." (Tr. 13). In making these conclusions, the ALJ specifically noted that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. 13, 14-21). The Magistrate Judge believes the ALJ adequately incorporated evidence in the record to support his conclusion that Plaintiff does not satisfy B criteria.

Because Plaintiff did not satisfy the "B" criteria, the Magistrate Judge turns to assess the "C" criteria, relevant to listings 12.02, 12.04 and 12.06. As to listings 12.02 and 12.04, "C" criteria requires a documented history of a mental disorder (at least two years in duration) that has

more than minimally limited the ability to do basic work activities, with symptoms "currently attenuated by medication or psychosocial support," *and* one of the following: "repeated episodes of decompensation, each of extended duration;" a residual disease process that results in decompensation with even "a minimal increase in mental demands or change in environment;"or current history of at least one year of "inability to function outside a highly supportive living arrangement[.]" 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.02, 12.04. As to listing 12.06, "C" criteria requires a medically documented finding "resulting in complete inability to function independently outside the area of one's home." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.06.

The Magistrate Judge believes the ALJ's findings that Plaintiff did not meet or equal listings 12.02, 12.04 and 12.06 are adequate in light of "C" criteria. Although the ALJ did not expressly discuss "C" criteria, the Magistrate Judge believes any corresponding error is harmless because the ALJ's findings are supported by substantial evidence in the record. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656-57 (6th Cir. 2009).

The ALJ noted evidence from March 2008, one year after the alleged onset date, that Plaintiff's "mental health records were consistent with missed appointments and an inability to contact the claimant." (Tr. 15). Despite stressors like Plaintiff's incarceration, domestic violence, custody issues and financial problems, the ALJ found it notable that Plaintiff was well dressed and groomed, liked to watch television and listen to music, had good support from her daughter, and repeatedly reported that she had no health concerns. *Id.* While Plaintiff reported instances of aggressive behavior occurring before her alleged onset date, the ALJ cited state agency psychological examiners' opinions that Plaintiff did not have extended episodes of decompensation–and their suggestions that Plaintiff was malingering. (Tr. 19-20). Further, the

ALJ found that Plaintiff did not have an inability to function outside a supportive living arrangement or her home. (Tr. 20). To the contrary, the ALJ stated that Plaintiff's "mental issues did not prevent her from shopping, socializing with family members, and frequently eating out with others." *Id*. Further, the ALJ questioned Plaintiff's credibility and noted that "she was normally alert and fully oriented, with consistent linear and goal directed thought processes." *Id.*

Plaintiff makes one final argument with regard to the ALJ's findings on listed impairments. Plaintiff argues that, even if it is determined that she does not meet the listings, "this case must still be remanded to obtain testimony from a medical expert to determine if the claimant equals any of these listings in accordance with SSR 96-6p." (Docket Entry 14-11, p. 13). The Magistrate Judge believes this argument fails. ALJs "*may* also ask for and consider opinions from medical experts[.]" 20 C.F.R. §404.1527 (f)(2)(iii) (italics added). The ALJ must call a medical expert only when, "*in the opinion* of the [ALJ]," an updated medical judgment may change the state agency consultant's finding that an impairment is not equivalent with a listing. SSR 96-6p, 1996 WL 374180 at *3-*4 (italics added). Thus, the ALJ had discretion in deciding whether to obtain testimony from a medical expert.

In short, substantial evidence in the record supports the ALJ's finding that, although Plaintiff had mental impairments, they were "not severe enough, either singly or in combination, to meet or medically equal the requirements for [listed impairments.]" (Tr. 12).

D.    The ALJ's RFC Conclusion is Supported by Substantial Evidence

Plaintiff argues that the ALJ erred in finding that she can perform a limited range of

sedentary work.  In support, Plaintiff primarily cites a list of subjective complaints; Dr. Millis'

opinion regarding limitations of her left upper extremity; and Dr. Davis' notes about a weak grip.

(Docket Entry 14-1, p. 14-15).

The ALJ noted the facts Plaintiff cites and found they do not support the idea that she

cannot perform even sedentary work.  (Tr. 18-19).  While Dr. Davis noted reduced left upper

extremity sensation and weak grip, he also went on to list work-related physical activities that

Plaintiff could perform and did not mention any corresponding limitation.  (Tr. 432).  As to Dr.

Millis' opinion that use of Plaintiff's left upper extremity was limited, the ALJ already explained

that his opinion was given little weight because it was inconsistent with the evidence of record

associated with Plaintiff's physical impairments.  (Tr. 18).

Additionally, as the Commissioner correctly points out, Dr. Davis' opinion (Tr. 430-32)

and Dr. Millis' opinion (Tr. 438-45) were made five to six months before Plaintiff's alleged onset

date in March 2007.  (Docket Entry 21, p.31.)  The Commissioner went on to cite more recent

evidence, like Dr. Cohn's August 2007 opinion that Plaintiff had no manipulative limitations.  (Tr.

479).

The Plaintiff herself stated that the "ALJ admits" a long list of her health and social

problems.  (Docket Entry 14-1, p.14).  Indeed, the ALJ properly acknowledged and discredited

Plaintiff's arguments in arriving at his decision.  (Tr. 13-22).  The Magistrate Judge believes the

ALJ had substantial evidence for his findings related to Plaintiff's RFC.


E.      The ALJ Properly Evaluated Plaintiff's Subjective Limitations

Plaintiff argues that "[t]he ALJ did not correctly evaluate [Plaintiff's] symptoms, including

pain[.]" (Docket Entry 14-1, p. 21). Specifically, Plaintiff claims the ALJ "failed to make a proper credibility finding regarding [Plaintiff's] subjective complaints." (*Id.*, p. 22).

To the extent that Plaintiff attacks the ALJ's credibility determination, the Magistrate Judge believes the ALJ had sufficient evidence for discounting Plaintiff's subjective complaints. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id.* Like any factual finding, however, an ALJ's adverse credibility finding must be reasonable and supported by substantial evidence. *Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx. 336, 342 (6th Cir. 2008) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Here, the ALJ had substantial evidence for discounting Plaintiff's credibility. The ALJ meticulously cited to and discussed relevant evidence in the record. (Tr. 13-21). In short, the ALJ sufficiently explained his findings as to Plaintiff's subjective complaints.

F.      The ALJ Did Not Err by Discounting the Opinions of Non-Treating Physicians

Plaintiff argues that the ALJ failed to properly consider the opinions of Dr. Carlson, Mr. Leach, Ms. Burnett, Nurse Yelverton and Nurse Hollis[8]. (Docket Entry 14-1, p. 17-18).

The distinction between treating and nontreating medical sources determine the level of

_____

[8]Plaintiff also discusses Dr. Suggs in this portion of her brief (Docket Entry 14-1, p. 18). The Magistrate Judge's analysis regarding Dr. Suggs, however, begins *infra* at section III.H.

weight the ALJ must afford their opinions.  Treating sources are distinguished by an "ongoing treatment relationship" with the patient.  20 C.F.R. §§ 404.1502, 416.902.  Generally speaking, this "ongoing treatment relationship" is determined by its frequency and context.[9]  *Id*.

The ALJ is not required to explain or list reasons for discounting the opinions of nontreating medical sources.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).  The record indicates that Dr. Carlson (Tr. 371-78) saw Plaintiff on two occasions–and Mr. Leach (Tr. 365-65, 427-29), Ms. Burnett (Tr. 246-48), Nurse Yelverton (Tr. 254) and Nurse Hollis (Tr. 366-70) only saw Plaintiff once.  Given the range and complexity of Plaintiff's numerous health problems outlined in the 626-page record, said visits do not establish an "ongoing treatment relationship."  As such, Dr. Carlson, Mr. Leach, Ms. Burnett, Nurse Yelverton and Nurse Hollis do not qualify as treating medical sources.  The ALJ did not err in discounting their opinions.

G.    The ALJ Properly Weighted the Opinions of Dr. Yoanidis, Dr. Mudumbi and Dr. Islam

Plaintiff argues that the ALJ erred in refusing to give controlling weight to the opinions of

---

[9]20 C.F.R. § 404.1502: "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source."

Dr. Yoanidis, Dr. Mudumbi and Dr. Islam.  (Docket Entry 14-1, p. 19-21).

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments.  20 C.F.R. § 404.1527(d)(2).  Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii).  If there is contrary medical evidence, however, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source and any other factors which tend to support or to contradict the opinion.  20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

The ALJ properly explained why the opinions of Dr. Yoanidis, Dr. Mudumbi and Dr. Islam were discounted.  As to Dr. Yoanidis, the ALJ noted the inconsistency in reports that Plaintiff had a relatively low GAF–but also that her thought process was linear and her concentration ability remained intact.  (Tr. 20, 250-53).  As to Dr. Mudumbi, the ALJ noted that a GAF score of 50 was assigned even though Plaintiff was alert and fully oriented, had logical and

goal-directed thought processes, and a good working memory. (Tr. 20, 608-15). As to Dr. Islam, the ALJ explained that the assertion that Plaintiff's mental health issues interfered with her ability to work is inconsistent with Dr. Islam's brief period of treatment and limited treatment notes. (Tr. 20, 519-20). The ALJ went on to state that the opinions of Dr. Yoanidis, Dr. Mudumbi, and Dr. Islam were "given little weight" because they were "inconsistent with the actual unimpressive limitations found upon evaluation" and "appeared to be given despite irregular contact with [Plaintiff.]" (Tr. 20). Considering his stated findings, the ALJ had sufficient evidence to discount the opinions of Dr. Yoanidi, Dr. Mudumbi and Dr. Islam.

H.      The ALJ Committed Reversible Error in Failing to Provide Good Reason for
        Discounting the Opinion of Treating Physician Dr. Suggs

The ALJ's decision contains no mention of Dr. Tammy Suggs, despite Plaintiff visiting Dr. Suggs on eight occasions from August 2004 until February 2005. (Tr. 12-22, 379-426). Given her ongoing treatment relationship with Plaintiff, Dr. Suggs can properly be called a treating physician. As stated above, the ALJ must provide "good reasons" for rejecting a treating physician's opinion. *Heckler*, 821 F.2d at 321. The ALJ erred by failing to do this.

The Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons[.]'" *Cole v. Astrue*, 652 F.3d 653, 661 (6th Cir. 2011), *quoting Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (citations omitted). That said, in some instances, the ALJ's failure to provide "good reasons" may be a *de minimis* procedural violation that qualifies as harmless error. *Wilson*, 378 F.3d at 547. For instance, reversal may be

unwarranted if the treating source opinion is "patently deficient," or if the Commissioner adopts or makes findings consistent with the treating source's opinion. *Id.* Error may also be harmless if the ALJ satisfied the safeguards of 20 C.F.R. § 404.1527(d)(2), which exist "to let claimants understand the disposition of their cases[.]" *Id.* at 544. Generally speaking, however, failure to follow the "good reasons" procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, F.3d at 661, *quoting Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).

The Magistrate Judge does not consider the ALJ's error in failing to provide good reasons for discounting Dr. Suggs' opinion to be harmless, especially when coupled with the VE testimony about Plaintiff's GAF scores.[10] Plaintiff's eight visits to Dr. Suggs produced fifty-one (51) pages of evidence in the record. (Tr. 379-426). Dr. Suggs' opinion was not patently deficient and could have been credited by the ALJ. The ALJ did not adopt Dr. Suggs's opinion and, while parts of it might be consistent with the ALJ's findings, it cannot be said that the ALJ's failure to mention Dr. Suggs is irrelevant. Further, the ALJ does not meet the goals of 20 C.F.R. § 404.1527(d)(2) because it is not clear why Dr. Suggs' opinion was given no credence despite her treating physician status and numerous findings.

The Magistrate Judge notes the possibility that remand in this case might not change the ALJ's decision. Nonetheless, the Sixth Circuit explained that remand is appropriate even if "the Commissioner reaches the same conclusion as to [Plaintiff's] disability while complying with the treating physician rule and the good reason requirement[.]" *Cole*, F.3d at 661. With compliance, the Plaintiff "will then be able to understand the Commissioner's rationale and the procedure

---

[10]If this case is remanded, it would also be useful if the ALJ comments on the VE testimony that a GAF score of 50 of less renders a person unemployable. (Tr. 48-49).

through which the decision was reached." *Id.* The Magistrate Judge believes this case should be remanded and notes that "[t]o hold otherwise . . . would afford the Commissioner the ability [to] violate the regulation[s] with impunity and render the protections promised therein illusory." *Id.*, *quoting Wilson*, 378 F.3d at 546.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **GRANTED** and this action be **REMANDED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 27th day of October, 2011.

/S/ Joe B. Brown

JOE B. BROWN
United States Magistrate Judge